**1722-CC11378**

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

HH ST. LOUIS RAILWAY LP, and )
RAILWAY EXCHANGE OWNER, LLC, )
)
              Plaintiffs, )
) Case No.
    -against- )
)
AFFILIATED FM INSURANCE COMPANY, ) **JURY TRIAL DEMANDED**
)
           Defendant. )

## PETITION FOR DECLARATORY RELIEF, DAMAGES FOR BREACH OF CONTRACT, DAMAGES FOR VEXATIOUS REFUSAL TO PAY, AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs, HH St. Louis Railway, LP, and Railway Exchange Owner, LLC, by undersigned counsel, hereby submit this Petition for Declaratory Judgment, Damages for Breach of Contract, Preliminary and Permanent Injunction, and Damages for Vexatious Refusal To Pay against Defendant, Affiliated FM Insurance Company as follows:

### THE NATURE OF THE ACTION

1.      This Petition is for declaratory relief, damages for breach of contract, damages for vexatious refusal to pay, and other relief, arising out of Affiliated FM Insurance Company's ("Affiliated FM") wrongful denial of, and refusal promptly to provide, insurance coverage under an all-risk property insurance policy.  Specifically, this Complaint involves Affiliated FM's refusal to pay claims under all-risk insurance policy number EP599 (the "REB Policy"), which it sold to Railway Exchange Owner, LLC ("REO").

2.      As shown below, REO's property at 600 Locust Street in St. Louis, Missouri, the Railway Exchange Building ("REB"), and the Missouri Development Finance Board's ("MDFB") property at 601 Locust Street (the "Seventh Street Garage") were severely damaged

by water and sludge following the rupture of a water main between 6th and 7th Streets on November 13, 2016 (the "Incident").

3.    REO promptly mitigated the loss and took appropriate measures to prevent further damage from the Incident.

4.    REO gave timely notice of the damage to the REB and the Seventh Street Garage to Affiliated FM, and thereafter did everything possible to secure timely acceptance and payment of their claims by Affiliated FM. REO complied with all conditions in the REB Policy.

5.    Much of the property damaged or destroyed by the Incident was in areas subject to easements encumbering the Seventh Street Garage but imposing duties upon the owner of the REB. Such property was covered by the REB Policy. REO and MDFB agreed that REO would perform the cleanup of both the REB and the Seventh Street Garage. REO and MDFB further agreed that REO would first seek to recover its costs under the REB Policy, and that, to the extent any costs it incurred as a result of the Incident were not paid by Affiliated FM under the REB Policy, MDFB would then seek coverage for such costs under Affiliated FM's all-risk insurance policy, EP852, sold to MDFB for the period of February 15, 2016 through February 15, 2017 (the "MDFB Policy").

6.    In January 2017, REO sold the REB to HH St. Louis Railway, LP ("HH"), and REO effected an assignment of its rights under the REB Policy in relation to obtaining coverage from Affiliated FM for the Incident to HH. Affiliated FM refused to acknowledge this assignment of claim, but that denial is without legal effect.

7.    Subsequently, HH and MDFB reaffirmed that HH would perform the cleanup of both the REB and the Seventh Street Garage, that REO and HH would first seek to recover the costs to do so under the REB Policy, and that, to the extent any costs incurred as a result of the

Incident were not paid by Affiliated FM under the REB Policy, MDFB would then seek coverage for such costs under the MDFB Policy.

8.      REO, HH and MDFB have done everything in their power to mitigate damage from the Incident and to effect timely repair and replacement of damaged and destroyed property.  These parties hired the Hays Group, Inc. d/b/a Hays Companies ("Hays") to coordinate this work and to assist them in securing insurance coverage from Affiliated FM. Hays filed a Proof of Loss under the REB Policy for $26,000,000.

9.      Affiliated FM has taken the unsupported position that a "Valuation" provision in the REB Policy capped recovery for damage to the REB at approximately $4,500,000.  In a detailed letter, Hays demonstrated that Affiliated FM's position was without factual or legal basis.  Affiliated FM refused to provide a substantive response to Hays' letter, but instead simply re-affirmed its original, erroneous interpretation and took a final position that its obligation to pay for damage to the REB is limited by the language of the REB Policy to approximately $4,500,000.

10.      Affiliated FM has breached the REB Policy by denying its obligation to pay for the full amount of covered damage to the REB and the Seventh Street Garage.  HH, as assignee of REO's rights under the REB Policy, and REO, to the extent that the assignment of claim somehow is not enforceable, bring this action seeking declaratory relief as to their rights to coverage under the REB Policy, for damages for breach of contract of the REB Policy, and for other extracontractual relief to which they are entitled under Missouri statute, and for injunctions preventing Affiliated FM from seeking to avoid judicial resolution of the legal issues it has raised about its coverage obligations by invoking appraisal.

## THE PARTIES

11.     HH St. Louis Railway LP is a Missouri limited partnership organized under the law of Missouri, located at 120 South Central Avenue, Clayton, Missouri 63105.

12.     Railway Exchange Owner, LLC is a Missouri limited liability company organized under the law of Missouri, located at 706 De Mun Avenue, Suite B, St. Louis, Missouri 63105.

13.     At all times hereinafter mentioned, Affiliated FM Insurance Company was and still is a foreign corporation organized and existing under and by virtue of the laws of Rhode Island, having its principal place of business 270 Central Avenue, Johnston, Rhode Island 02919.

14.     At all times hereinafter mentioned, Affiliated FM was and is authorized by the Superintendent of the State of Missouri to issue policies of insurance in this State.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this civil action pursuant to Mo. Const. art. V, § 14(a).

16.     Venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.2(4).

## FACTUAL BACKGROUND

### A.     The Policies

17.     Affiliated FM sold the REB Policy for the period August 19, 2015 through August 19, 2016. REB Policy, Declarations, § A. The Named Insured under the REB Policy is Railway Exchange Owner, LLC. REB Policy, Declarations, § B. The Policy Limit of the REB Policy is $50,000,000. REB Policy, Declarations, § C. The standard deductible of the REB Policy is $25,000. REB Policy, Declarations, § G.5.

18.     The REB Policy is an "All Risk" property insurance policy, covering all risks of physical loss or damage except those specifically excluded. REB Policy, Declarations at § E. All risk insurance coverage is the broadest available first party insurance coverage.

- 4 -

19.     The REB Policy was drafted by Affiliated FM.  The core coverage form employed in each policy is Affiliated FM's PRO AR 4100 (04/15).

20.     REO and HH have complied with all applicable conditions in the REB Policy, and REO paid all premiums due under the REB Policy.

21.     By reason of its sale of the REB Policy, Affiliated FM owes duties of good faith and fair dealing to REO and HH.

### 1.     The Core Insuring Agreement

22.     The primary insuring agreement in the REB Policy reads as follows:

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, at or within 1,000 feet of a **described location**, to the extent of the interest of the Insured in such property.

**1.**     Real Property in which the Insured has an insurable interest.

**2.**     Personal Property:

    **a)**     Owned by the Insured.

    **b)**     Consisting of improvements and betterments in which the Insured has an insurable interest.

    **c)**     Of directors, officers and employees of the Insured.

    **d)**     Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

    **e)**     Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

REB Policy, All Risk Coverage, § A.  The REB Policy contains a $50,000,000 limit with certain "sublimits."  Indeed, as the REB Policy covers, almost exclusively, the REB and physically-connected buildings to which REO had and HH has easement rights, REO selected the amount of coverage largely on the basis of the value of the REB.

- 5 -

### 2.   Expense To Reduce Loss

23.   The REB Policy contains the following "expense to reduce loss" provision:

This Policy also covers expenses reasonably and necessarily incurred by the
Insured to reduce the loss otherwise payable under this Policy. The amount of
such recoverable expenses will not exceed the amount by which the loss is
reduced.

REB Policy, Business Interruption, § A. There is no sublimit in the REB Policy for "expense to

reduce loss."

### 3.   Debris Removal

24.   The Debris Removal provision of the REB Policy provides:

This Policy covers the reasonable and necessary costs incurred to remove debris
from a **location** that remains as the direct result of insured physical loss or
damage.

This coverage does not cover the costs of removing:

**a)**   Contaminated uninsured property; or

**b)**   The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

This coverage includes the costs of removal of contaminated insured property or
the **containment** in or on insured property only if the **contamination**, due to the
actual not suspected presence of **contaminant(s)**, of the debris resulted directly
from other physical damage not excluded by the Policy.

REB Policy, All Risk Coverage, § D.7. There is no sublimit in the REB Policy for Debris

Removal. REB Policy, Declarations, § F.

### 4.   Decontamination Costs

25.   The REB Policy provides the following Decontamination Costs coverage:

If insured property is contaminated as a direct result of insured physical damage
and there is in force at the time of the loss any law or ordinance regulating
**contamination** due to the actual not suspected presence of **contaminant(s)**, then
this Policy covers, as a direct result of enforcement of such law or ordinance, the
increased cost of decontamination and/or removal of such contaminated insured
property in a manner to satisfy such law or ordinance. This coverage applies only

- 6 -

to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing:

**a)**      Contaminated uninsured property; or

**b)**      The **contaminant** in or on uninsured property;

Whether or not the **contamination** results from insured physical loss or damage.

REB Policy, All Risk Coverage, § D.8.  There is no sublimit in the REB Policy for

Decontamination Costs.  REB Policy, Declarations, § F.

### 5.    Expediting Expense

26.     The REB Policy provides the following Expediting Expenses coverage:

This Policy covers the reasonable and necessary costs incurred to:

**a)**      Temporary repair or replace; and

**b)**      Expedite the permanent repair or replacement of;

Insured property that has sustained insured physical loss or damage.

This coverage does not include expenses payable elsewhere in this Policy including the cost of permanent repair or replacement of damaged property.

REB Policy, All Risk Coverage, § D.13.  The REB Policy contains a $250,000 sublimit for

Expediting Expense.  REB Policy, Declarations, § F.

### 6.    Land and Water Clean Up Expense

27.     The REB Policy provides the following Land and Water Clean Up Expense

coverage:

This Policy covers the reasonable and necessary costs to remove, dispose of or clean up the actual but not the suspected presence of **contaminant(s)** from uninsured land or water or any substance in or on land, at a **location**, when such property is contaminated as a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to clean up, remove or dispose of **contamination** from such property:

**a)**     At any **location** insured for Personal Property only.

**b)**     When the Insured fails to give written notice of loss to this Company within 180 days after the inception of the loss.

REB Policy, All Risk Coverage, § D.17.  The REB Policy contains a $100,000 sublimit for Land and Water Clean Up Expense.  REB Policy, Declarations, § F.

### 7.     Professional Fees

28.     The REB Policy provides the following coverage for Professional Fees:

This Policy covers the reasonable and necessary expenses incurred by the Insured of:

**a)**     Auditors;

**b)**     Accountants;

**c)**     Architects;

**d)**     Engineers; or

**e)**     Other professionals; and

**f)**     The Insured's own employees.

For producing and certifying particulars or details to determine the amount of loss payable under this Policy for which this Company has accepted liability.

This coverage does not include the fees and expenses of attorneys, public adjusters, loss appraisers, loss consultants or any of their subsidiaries or related or associated entities.

REB Policy, All Risk Coverage, § D.22.  The REB Policy contains a $100,000 sublimit for Professional Fees.  REB Policy, Declarations, § F.

### 8.     Protection and Preservation of Property – Property Damage

29.     The REB Policy provides the following coverage for Protection and Preservation of Property – Property Damage:

This Policy covers the reasonable and necessary costs incurred for:

**a)**     Actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property....

**e)**     Temporary security for a period of time not to exceed 30 consecutive days due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property....

This coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

REB Policy, All Risk Coverage, § D.24.  There is no sublimit in the REB Policy for Protection

and Preservation of Property – Property Damage, except that this coverage includes a sublimit

"not to exceed $250,000 for security costs."  REB Policy, Declarations, at F.

      **9.**     **Extra Expense**

30.     The REB Policy contains the following Extra Expense provision:

The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:

**a)**     Temporarily continue as close to normal the conduct of the Insured's business; and

**b)**     Temporarily use the property or facilities of the Insured or others;

All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

Extra Expense Exclusions:  As respects Extra Expense, the following additional exclusions apply:

This Policy does not insure:

**a)**     Any loss of income;

**b)**     Expenses that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

**c)**     The cost of permanent repair or replacement of property that has been damaged or destroyed.

**d)**     Any expense recoverable elsewhere in this Policy.

REB Policy, Business Interruption, § B.4.  The REB Policy contains a $5,000,000 sublimit for

Extra Expense.  REB Policy, Declarations, § F.

31.    The Period of Liability provision in the REB Policy states:

The Period of Liability for Business Interruption Coverage and Business
Interruption Coverage Extensions, unless otherwise stated elsewhere in this
Policy, is as follows:

The Gross Earnings, Rental Income or Extra Expense Period of Liability is:

1.    The period starting from the time of physical loss or damage of the type
       insured; and

2.    Ending when, with due diligence and dispatch,

   a)    The lost or damaged property could be repaired or replaced and
          made ready for production or business operations or services under
          the same or equivalent physical operating conditions that existed
          prior to the loss or damage; or

   b)    The lost or damaged property under the course of construction or
          renovation could be repaired or replaced to the same or equivalent
          degree of completion that existed prior to the loss or damage.  This
          period of time will be applied to the level of business that would
          have been reasonably achieved after construction and startup
          would have been completed had no physical damage happened.

REB Policy, Business Interruption, § C.

### 10.    Soft Costs

32.    The REB Policy contains the following Soft Costs coverage:

This Policy covers **soft costs** incurred by the Insured during the Period of
Liability arising out of the delay in the completion of buildings and additions
under construction directly resulting from physical loss or damage of the type
insured to insured property under construction at **locations**.

REB Policy, Business Interruption, § E.13.  The REB Policy contains a $100,000 sublimit for

Soft Costs.  REB Policy, Declarations, § F.

### 11.    Valuation

33.    The REB Policy contains the following Valuation provision:

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1.      Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

    a)      The cost to repair.

    b)      The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

    c)      The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

*   *   *

8.      On real property or machinery and equipment, other than stock, offered for sale on the date of loss, the selling price.

*   *   *

The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expanded on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a **described location** under this Policy.  This item does not extend to Demolition and Increased Cost of Construction.

REB Policy, Loss Adjustment and Settlement, at § L.

    **12.      Property Excluded**

34.      The REB Policy includes within the "Property Excluded" "Land, water or any substance in or on land."  REB Policy, All Risk Coverage, § B.1.

    **B.      The Incident**

35.      The REB is located at 600 Locust Street in St. Louis, Missouri.

36.      MDFB owns the Seventh Street Garage, located at 601 Locust Street in St. Louis, Missouri.

- 11 -

37.     Under certain easement agreements (the "Easements"), the REB is benefitted by certain easement rights burdening the Seventh Street Garage.  In consideration thereof, the Easements impose certain responsibilities and obligations on the owner of the REB to remediate damage to property in areas within the scope of the easement rights.

38.     On November 13, 2016, a contractor conducting local excavation work in front of the REB and the Seventh Street Garage hit a water main on Locust Street between 6th Street and 7th Street resulting in the collapse of the street lying between the REB and the Seventh Street Garage, and the intrusion of water and sludge into the REB and the Seventh Street Garage.

39.     As a result of the Incident, the basement and first floor of the REB were severely damaged by intrusion of water and sludge.

40.     As a result of the Incident, sludge and water filled the entire sub-basement of the Seventh Street Garage, and filled the basement to a depth of six feet.

41.     REO and MDFB immediately took steps to mitigate the damage from the Incident, to both the REB and the Seventh Street Garage.

C.     **The Remediation, Repair and Cooperation Agreement**

42.     In the wake of the Incident, MDFB and REO disputed which party was responsible, per the terms of the Easements, for cleanup, repair and restoration of damaged property at the Seventh Street Garage.

43.     MDFB and REO agreed that REO, and then HH, would remediate all damage to the REB and the Seventh Street Garage and seek coverage for those efforts under the REB Policy.  These parties further agreed that MDFB would maintain an open claim for coverage for damage from the Incident under the MDFB Policy.  These parties further agreed that, to the extent that Affiliated FM took the position that any portion of the costs incurred by REO and

then HH in relation to their response to the Incident was covered not by the REB Policy but by the MDFB Policy, MDFB would secure coverage for such costs under the MDFB Policy.

44.     By July 23, 2017, the agreements described in Paragraph 43 were formalized in a Remediation, Repair and Cooperation Agreement.

**D.     The Purchase Agreement and Amendments**

45.     On April 21, 2016, REO and certain original purchasers effected a Purchase Agreement for the REB and certain other property for a "Purchase Price" of $19,500,000. This Purchase Agreement permitted the original purchasers to cancel the Purchase Agreement in the event of substantial loss or damage to the REB or the other property listed in the Purchase Agreement.

46.     On May 19, 2016, June 3, 2016, and June 24, 2016, REO and the original purchasers effected an Amendment to Purchase Agreement, a Second Amendment to Purchase Agreement, and a Third Amendment to Purchase Agreement, respectively, amending certain terms of the Purchase Agreement.

47.     On July 1, 2016, REO and the original purchasers effected a Fourth Amendment to Purchase Agreement, amending certain terms of the Purchase Agreement; specifically, the Fourth Amendment amended the Purchase Price of the REB and other property to $19,975,000, and purported to allocate $13,000,000 of that Purchase Price to the REB.

48.     On July 28, 2016, REO and HH effected a Fifth Amendment to Purchase Agreement, amending certain terms of the Purchase Agreement; specifically, the Fifth Amendment replaced the original purchasers with HH.

49.     On August 19, 2016, REO and HH effected a Sixth Amendment to Purchase Agreement, amending certain terms of the Purchase Agreement.

50.     On September 2, 2016, REO and HH effected a Seventh Amendment to Purchase Agreement, amending certain terms of the Purchase Agreement; specifically, the Seventh Amendment conditioned the ultimate Purchase Price of the REB and other property on the date of closing if REO was not prepared to close by September 19, 2016, and purported to allocate $9,000,000 of the Purchase Price to the REB.

51.     On October 24, 2016, REO and HH effected an Eighth Amendment to Purchase Agreement, amending the Purchase Price of the REB and other property.

52.     On January 5, 2017, REO and HH effected a Ninth Amendment to Purchase Agreement, which acknowledged the Incident, REO's notification of the Incident to HH per the terms of the Purchase Agreement, and HH's intent not to terminate the Purchase Agreement per the terms of the Purchase Agreement.

53.     Closing on HH's purchase of the REB and other property occurred on January 31, 2017.  The ultimate Purchase Price paid for the REB and other property was $21,500,000, of which $18,000,000 was allocated to the REB.

54.     Contemporaneously with the closing, REO, by an Insurance Assignment, assigned its rights to recover for loss or damage from the Incident under the REB Policy to HH.

**E.     Affiliated FM's Adjustment of the Claim under the REB Policy**

55.     REO gave timely notice of the Incident to Affiliated FM.

56.     By letter of December 1, 2016, Affiliated FM quoted part of REB Policy, Loss Adjustment and Settlement, at § L, and appeared to argue that recovery was capped at the "offered for sale or selling price" of the REB:

> Please note that on valuation #8 above, the offered for sale or selling price valuation limit includes debris removal, excluding contents removal from the limit.  The offered for sale or selling price does not include the value of the land, as land is an excluded item in the policy.

Letter, dated Dec. 1, 2016, from Terry Knowlton to Bill Munaco.

57.     By letter of 19 December 2016, Affiliated FM offered "an initial advance payment of $2 million net of the $25,000 deductible." Letter, dated Dec. 19, 2016, from Terry Knowlton of Affiliated FM to Bill Munaco of REO. Noting the Seventh Amendment to Purchase Agreement, dated September 2, 2016, Affiliated FM indicated that it intended to include HH in all payments. Id. Mischaracterizing the Valuation provision in the REB Policy, Affiliated FM further stated, incorrectly, that § L.8 capped recovery at "the selling price or the amount offered for sale on the date of loss":

> Per the Valuation language discussed in our letter dated 1-December-2016, the valuation is limited to the selling price or the amount offered for sale on the date of loss. Per the purchase agreement previously referred to, the agreed sales price for the Railway Exchange Building totals $9,000,000. Therefore, the valuation limit that applies is $9,000,000, less the value of the land (to be determined). Please advise if you concur with our assessment of the purchase agreement and valuation amount. Please also identify the value of the land and how you arrived at that amount. Should the amount incurred for repairs end up less than the limit amount, only the amount incurred less any applicable deductible would be recoverable.

Id. at 2. Finally, Affiliated FM noted, with regard to the Easements, that "[i]t is unclear at this point who is responsible for the repairs to the easement area as described in the documents." Id.

58.     By letter of February 2, 2017, Affiliated FM extended the date by which a proof of loss relative to coverage under the REB Policy for the Incident could be filed until May 19, 2017.

59.     By letter of March 7, 2017, REO informed Affiliated FM that REO had sold the REB to HH, and that as part of that transaction, REO had "assigned its rights under Affiliated FM Insurance Company policy number EP599 (the 'Policy') to recover all loss or damage from the November 13, 2016 incident at and around the Railway Exchange Building to HH." Letter, dated March 16, 2017, from Christine Miller to Terry Knowlton.

60.     On March 16, 2017, Affiliated FM sent a letter to REO.  Letter, dated Mar. 16,

2017, from Terry Knowlton to Richard Yackey.  In this letter, Affiliated FM refused to give

written consent to assignment of REO's rights to pursue coverage for the Incident under the REB

Policy to HH.  Id. at 1.  Next, citing the Valuation provision of the REB Policy and "the agreed

selling price for the Railway Exchange Building [of] $9,000,000," Affiliated FM took the

position that "the valuation limit that applies is $9,000,000, less $4,310,000 for the value of the

uninsured land, for a net building valuation policy limit of $4,690,000."  Id. at 2.  Affiliated FM

then stated:

> Our actual cash value measurement of the repairs to the building of $9,248,232.53
> referenced above exceeds the building valuation policy limit of $4,690,000.
> Therefore, the net amount owed is the building valuation policy limit of
> $4,690,000, less the advance payment of $2,000,000, for net payment of
> $2,690,000.  The applicable deductible of $25,000 is applied to the gross loss and
> then the limit based on the policy valuation is considered to arrive and the amount
> payable of $2,690,000.

Id.  Because HH had not terminated the purchase, Affiliated FM indicated that it would include

HH on this payment.  Id. at 3.

61.     As a result of Affiliated FM's refusal to consent to the assignment, by March 31,

2017, REO and HH formalized an agency agreement by which Hays was appointed as REO's

agent for purposes of pursuing coverage for damage from the Incident under the REB Policy.

62.     By letter to Affiliated FM of April 10, 2017, Hays made four points:  (1) the

Valuation provision in the REB Policy did not contain the language of the limitation referenced

by Affiliated FM in letters, and was otherwise ambiguous and unenforceable; (2) the Valuation

provision was unenforceable under Missouri statute; (3) nothing in the REB Policy permitted

Affiliate FM to slash its payment by allocating portions of the Purchase Price to other buildings

or land; and (4) at a minimum, multiple coverages implicated by the Incident were not "physical

loss amounts" subject to any limitation in Valuation § L.8.  Letter, dated April 10, 2017, from

Seth Frohlich to Terry Knowlton, at 2-10. This letter indicated that Affiliated FM was exposing itself to extra-contractual damages for vexatious refusal to pay a claim. Id. at 10-11.

63.     By letter of April 17, 2017, Affiliated FM responded to Hays' letter of April 10, 2017, but refused to address, substantively, any of the points made in Hays' letter. Letter, dated April 17, 2017, from Terry Knowlton to Seth Frohlich. Rather, Affiliated FM stated only the following:

> Please be advised that we disagree with the assertions in your April 10, 2017 letter as well as your coverage analysis. We disagree that the AFM provision policy is ambiguous. Therefore, our position regarding coverage afforded under the AFM provision Policy No. EP599 has not changed.

Id. Affiliated FM then stated that it would make payment of the undisputed amounts, and that "[p]ayment, and negotiation of AFM's checks, is without prejudice to the insured's rights under the policy." Id. at 1.

64.     On May 17, 2017, Affiliated FM extended the date by which a proof of loss relative to coverage under the REB Policy for the Incident could be filed until June 19, 2017.

65.     On June 19, 2017, REO and HH submitted a preliminary Proof of Loss totaling $26,000,000.

66.     On July 14, 2017, Affiliated FM purported to respond to the preliminary Proof of Loss by rejecting it and continuing to incorporate and rely upon its unsupported bases for denying payment for the vast majority of REO's and HH's claim.

67.     On July 20, 2017, REO and HH re-submitted the preliminary Proof of Loss totaling $26,000,000.

68.     On August 17, 2017, Affiliated FM purported to respond to the re-submitted preliminary Proof of Loss by rejecting it and continuing to incorporate and rely upon its unsupported bases for denying payment for the vast majority of REO's and HH's claim.

69.     Subject to its positions described above, Affiliated FM has otherwise accepted

coverage and made two payments totaling $4,895,234.32.

**F.**     **The Law Governing Claims for Insurance Coverage Such as Those Made by HH, REO, and MDFB**

70.     A number of the broad coverages provided by Affiliated FM in the REB Policy

overlap to a considerable degree.  Under applicable law, to the extent that a cost or loss incurred

by a policyholder is covered by more than one coverage, the policyholder is entitled to order its

claim so as to maximize its recovery.

71.     Under Missouri Revised Statutes 375.1007, entitled "Improper Claims Practices,"

the following are improper claims practices:

> (1) Misrepresenting to claimants and insureds relevant facts or policy provisions relating to coverages at issue;
>
> (2) Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;
>
> (3) Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;
>
> (4) Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;
>
> (5) Compelling insureds or beneficiaries to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;
>
> (6) Refusing to pay claims without conducting a reasonable investigation;
>
> (7) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the insurer;
>
> … (12) Failing in the case of claims denial or offers of a compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such actions; and
>
> … (15) Failing to promptly settle claims where liability has become reasonably clear under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

## THE CONTROVERSY

72.     Based on the above circumstances, a justiciable case and controversy exists about the meaning of a variety of terms and provisions in the REB Policy and the application of those terms and provisions to costs incurred by REO, HH and MDFB as a result of the Incident.

73.     Affiliated FM's core position is that its obligations in relation to the REB are capped by REB Policy, Loss Adjustment and Settlement, at § L.8, which provides: "Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy: …. On real property or machinery and equipment, other than stock, offered for sale on the date of loss, the selling price." Specifically, citing the Seventh Amendment to Purchase Agreement, Affiliated FM stated that the "agreed selling price" of the REB was $9,000,000, subtracted an estimate of the "appraised market value of the land," $4,310,000, and concluded that there is "a net building valuation policy limit of $4,690,000." Letter, dated March 16, 2017, from Terry Knowlton to Richard Yackey.

74.     Affiliated FM's core position is wrong for the following reasons:

   a.      Affiliated FM's reading of Section L.8 adds words of limitation which are not present in the REB Policy but are present in other Affiliated FM provisions in commercial use, in violation of Missouri rules of insurance policy construction.

   b.      Affiliated FM's construction of Section L.8 contravenes the reasonable expectations of REO and HH.

   c.      Section L.8 is unenforceable under and contrary to Missouri statutory law.

   d.      Section L.8 is fatally ambiguous.

   e.      The "selling price" of the REB was $21,500,000, **not** the $19,975,000 identified in the Fourth Amendment to Purchase Agreement.

f.      Although the REB Policy does not permit Affiliated FM to allocate the "selling price" among other properties included within the sale, the amount allocated to the REB was $18,000,000 in the closing documents when the transaction was consummated, **not** $9,000,000 as identified in the Seventh Amendment to Purchase Agreement.

g.      Nothing in the REB Policy permits Affiliated FM to allocate any portion of the "selling price" to the value of land, although other Affiliated FM forms in commercial use did permit such allocation.

h.      Section L.8 applies only to "physical loss amounts," and thus does not apply to amounts claimed as Expense To Reduce Loss, Debris Removal, Decontamination Costs, Demolition and Increased Cost of Construction, Expediting Expenses, Land and Water Clean Up Expense, Professional Fees, Protection and Preservation of Property – Property Damage, Extra Expense and Soft Costs, among other things.

75.     Hays has made all of the points listed in Paragraph 74 clear to Affiliated FM orally and in writing but Affiliated FM refused to address any of them or further explain its denial of coverage for any costs incurred to remediate the REB above $4,690,000.  Rather, AFM arbitrarily and summarily reaffirmed its denial.

76.     REO and HH now seek a declaratory judgment from this Court finding that Affiliated FM must provide the full insurance proceeds to REO or HH for the claim for loss and damage arising from the Incident under a proper and commercially reasonable interpretation of the insuring coverage provisions in the REB Policy, that Affiliated FM's coverage positions constitute a breach of the REB Policy, and that REO and HH cannot be compelled to submit this

dispute to appraisal.  Further, REO and HH seek an award of direct and consequential damages for Affiliated FM's breaches.  REO and HH also seek extracontractual damages and attorney fees for Affiliated FM's vexatious refusal to pay a valid claim.

77.     Further, REO and HH seek to enjoin Affiliated FM from pursuing appraisal.

## COUNT I

### (DECLARATORY JUDGMENT BY REO AND HH AGAINST AFFILIATED FM)

78.     REO and HH repeat and reallege the allegations in paragraphs 1 through 77, as if the same were set forth at length herein.

79.     Affiliated FM has taken various coverage positions denying REO and HH full recovery for their loss and damage from the Incident.

80.     Affiliated FM has breached and continues to breach its contractual obligations, as set forth in the REB Policy, as well as the duties of good faith and fair dealing to REO and HH, by failing and refusing to honor the terms of the REB Policy.

81.     An actual and justiciable controversy exists between REO and HH and Affiliated FM regarding the interpretation of provisions of the REB Policy, including:  Declarations, § F; All Risk Coverage, § A; Business Interruption, § A; All Risk Coverage, § D.7; All Risk Coverage, § D.8; All Risk Coverage, § D.13; All Risk Coverage, § D.17; All Risk Coverage, § D.22; All Risk Coverage, § D.24; Business Interruption, § B.4; Business Interruption, § C; Business Interruption, § E.13; and Loss Adjustment and Settlement, at § L.

82.     A declaratory judgment determining REO and HH's insurance coverage rights under the REB Policy is imperative because REO and HH have suffered, and continue to suffer, severe financial consequences as a result of Affiliated FM's refusal to pay REO's and HH's insured losses from the Incident.

83.     Accordingly, REO and HH are entitled to a declaratory judgment by this Court of the obligations of Affiliated FM under the REB Policy, and specifically, REO and HH are entitled to a declaratory judgment that they have coverage under the REB Policy for all of their claimed losses from the Incident.

84.     REO and HH are also entitled to a declaration that they are not required to submit to an appraisal of any of the issues identified in this Complaint or otherwise existing between REO and HH and Affiliated FM; alternatively, REO and HH are entitled to a declaration that they are not required to submit to an appraisal until this Court resolves all of the legal issues in this case.

85.     Declaratory relief from this Court will resolve outstanding issues between REO and HH and Affiliated FM regarding the obligations of Affiliated FM under the REB Policy.

## COUNT II

## (BREACH OF CONTRACT BY REO AND HH AGAINST AFFILIATED FM)

86.     REO and HH repeat and reallege the allegations in paragraphs 1 through 85, as if the same were set forth at length herein.

87.     As set forth above, Affiliated FM breached the REB Policy by refusing to honor the express terms of the REB Policy, and by refusing to pay, and by denying its obligation to pay, amounts due to HH and/or REB under the terms of the REB Policy.

88.     As a result of Affiliated FM's breaches of its obligations under the REB Policy, HH and/or REB have suffered direct damages and consequential damages in an amount to be established at trial.

## COUNT III

### (REO AND HH'S REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AGAINST AFFILIATED FM)

89.     REO and HH repeat and reallege the allegations in paragraphs 1 through 88, as if the same were set forth at length herein.

90.     Because Affiliated FM has denied coverage for outstanding elements in REO and HH's claim, the appraisal provision does not apply to these elements.

91.     The REB Policy allows Affiliated FM to demand appraisal only on the issue of the "amount of the loss," and only when the amount of the loss is not intertwined with legal issues, such as those raised by Affiliated FM or otherwise identified in this Complaint.

92.     Requiring REO and HH to submit the issues identified in this Complaint to appraisal would deprive REO and HH of their contractual and due process rights, and cause REO and HH other irreparable harm.

93.     REO and HH are entitled to preliminary and permanent injunctive relief because they are likely to succeed on the merits of their position that the legal issues in this dispute must be resolved prior to any appraisal, REO and HH will suffer irreparable harm if forced to appraise any part of this dispute, no adequate remedy at law exists, and the balance of the equities counsel in favor of granting injunctive relief sought by REO and HH.

94.     Accordingly, Affiliated FM should be preliminary and permanently enjoined from attempting to force REO and HH to submit any of the issues raised in this action to appraisal; alternatively, this Court should enjoin Affiliated FM from seeking an appraisal for issues for which appraisal is unreasonable or until this Court resolves all of the legal issues in this case.

## COUNT IV

### (VEXATIOUS REFUSAL TO PAY BY REO AND HH AGAINST AFFILIATED FM)

95.     REO and HH repeat and reallege the allegations in paragraphs 1 through 94, as if the same were set forth at length herein.

96.     Affiliated FM has, vexatiously and without reasonable cause, refused to pay REO and HH amounts due under the REB Policy.  For example:

a.      By letter of December 1, 2016, Affiliated FM quoted part of REB Policy, Loss Adjustment and Settlement, at § L, and misrepresented the language of that provision, stating it capped recovery at the "offered for sale or selling price" of the REB.  Letter, dated Dec. 1, 2016, from Terrence Knowlton to Bill Munoco. In fact, that provision reads:  "On real property or machinery and equipment, other than stock, offered for sale on the date of loss, the selling price."  REB Policy, Loss Adjustment and Settlement, at § L.

b.      Affiliated FM made this misrepresentation in its December 1, 2016 letter with the knowledge that other versions of the policies it sells read as follows:

3) If during the term of this policy, any insured real property is offered for sale, the liability for loss or damage will not exceed the lesser of:

a) The price of the offer for sale while the property is offered for sale (with proper deduction for the value of any land); or

b) The cost to repair or replace.

See, e.g., Florida Gaming Corp. v. Affiliated FM Ins. Co., No. 1:07CV20897, 2008 WL 7072204 (S.D. Fla. May 23, 2008) (exhibit at § 14.c.3.).

c.      In that same December 1, 2016 letter, Affiliated FM misrepresented REB Policy, Loss Adjustment and Settlement, at § L by stating "[t]he offered for sale or selling price does not include the value of the land, as land is an excluded item in the policy."  Letter, dated Dec. 1, 2016, from Terrence Knowlton to Bill Munoco.  As Affiliated FM knew, to exclude for the value of land, such reference must be express, as it is in other Affiliated FM policy forms.  See, e.g., Florida Gaming, (exhibit at § 14.c.3.(a)) ("[t]he price of the offer for sale while the property is offered for sale (with proper deduction for the value of any land)").

d.      Three weeks later, Affiliated FM misrepresented REB Policy, Loss Adjustment and Settlement, at § L again, taking the position that it capped coverage at "the selling price or the amount offered for sale on the date of loss." Letter, dated Dec. 19, 2016, from Terrence Knowlton to Bill Munaco, at 2.

e.     In the same December 19, 2016 letter, Affiliated FM again misrepresented REB Policy, Loss Adjustment and Settlement, at § L as permitting it to discount the "value of the land," despite knowing language addressing land was absent from that provision. Id.

f.     By letter of March 16, 2017, Affiliated FM, without any legitimate basis, refused to provide written consent to the REO's assignment of its rights to recover for the Incident under the REB Policy. Letter, dated Mar. 16, 2017, from Terry Knowlton to Richard Yackey.

g.     In this March 16, 2017 letter, Affiliated FM again misrepresented the content of REB Policy, Loss Adjustment and Settlement, at § L. Id.

h.     Further, in this March 16, 2017 letter, despite the fact that the REB had been transferred and that there was a final sale price and a final allocation of value to the REB ($18,000,000), Affiliated FM employed a lower allocation from the Seventh Amendment to Purchase Agreement, which it knew to be out-dated and inoperative. Id.

h.     Affiliated FM further continued to misrepresent that REB Policy, Loss Adjustment and Settlement, at § L permitted it to discount the "value of uninsured land." Id.

i.     Hays identified each and every one of Affiliated FM's misrepresentations by letter of April 10, 2017, and sought to have Affiliated FM retract its unfounded positions. Letter, dated April 10, 2017, from Seth Frohlich to Terry Knowlton. This letter also identified multiple coverages in the REB Policy which were not coverage for "physical loss amounts" and thus could not be capped by REB Policy, Loss Adjustment and Settlement, at § L.

j.     Affiliated FM did not provide a substantive response, thereby affirming each and every misrepresentation it has made about the REB Policy. Letter, dated Apr. 17, 2017, from Terry Knowlton to Seth Frolich.

k.     Further, in its April 17, 2017, July 14, 2017 and August 17, 2017 letters, Affiliated FM affirmed its unsupported position that it owed $4,690,000, and thus arbitrarily and without any reasonable support denied that it owed REO or HH any coverage under the following provisions: Expense To Reduce Loss, Debris Removal, Decontamination Costs, Demolition and Increased Cost of Construction, Expediting Expenses, Land and Water Clean Up Expense, Professional Fees, Protection and Preservation of Property – Property Damage, Extra Expense and Soft Costs.

97.     As a result of Affiliated FM's vexatious refusal to pay, HH and REO are entitled to additional damages not exceeding 20% of the first fifteen hundred dollars of the loss, ten percent of the amount of loss in excess of fifteen hundred dollars, and their attorney's fees.

## JURY DEMAND

98.     REO and HH demand a trial by jury on all causes of action.

### REQUEST FOR RELIEF

WHEREFORE, REO and HH are entitled to (1) a declaration pursuant to Missouri Revised Statutes 527.010 by this Court setting forth REO and HH's rights to insurance coverage for costs incurred in relation to the Incident under the REB Policy; (2) a declaration that HH and REO cannot be compelled to submit this dispute to appraisal; (3) an award of compensatory, direct and consequential damages in an amount established by the evidence; (4) preliminary and permanent injunctions prohibiting Affiliated FM from attempting to submit any of the issues raised in this action to appraisal; (5) damages not exceeding 20% of the first fifteen hundred dollars of the loss, ten percent of the amount of loss in excess of fifteen hundred dollars, and their attorney's fees; (6) costs of suit and reasonable attorneys' fees; and (7) such additional relief as the Court deems just and appropriate.

Respectfully Submitted,

Dated:  September 21, 2017

Katie C. Pawlitz
REED SMITH LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C., 20005
Tel:  (202) 414-9200
Fax:  (202) 414-9299
kpawlitz@reedsmith.com

*Attorney for Plaintiffs, HH St. Louis Railway, LP,
and Railway Exchange Owner, LLC*

- 26 -

John N. Ellison
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania   19103
Tel:  (215) 851-8100
Fax:  (215) 851-1420
jellison@reedsmith.com

*Attorney for Plaintiffs, HH St. Louis Railway, LP,
and Railway Exchange Owner, LLC*

Linda D. Kornfeld
KASOWITZ BENSON TORRES LLP
2029 Century Park East
Suite 2000N
Los Angeles, California   90067
Tel:  (424) 288-7900
Fax:  (424) 288-7901
lkornfeld@kasowitz.com

*Attorney for Plaintiffs, HH St. Louis Railway, LP,
and Railway Exchange Owner, LLC*