# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| HH ST. LOUIS RAILWAY LP, MISSOURI DEVELOPMENT FINANCE BOARD, and RAILWAY EXCHANGE OWNER, LLC, | ) ) ) ) ) | Case No. 4:18-cv-01132 |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Jury Trial Demanded** |
| AFFILIATED FM INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

# AFFILIATED FM INSURANCE COMPANY'S
# REPLY MEMORANDUM IN SUPPORT OF ITS CROSS MOTION FOR
# PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT.......................................................................................................................... 2

    A.    REO concedes that AFM's "Valuation" provision is enforceable under Missouri law.................................................................................................2

    B.    Because the REB is "real property" and was "offered for sale on the date of loss," the AFM policy plainly and unambiguously provides that the measurement of the loss is determined by the selling price. ............2

    C.    The selling price of the REB was $9 million. ......................................................6

        1.    There is no genuine factual dispute that the selling price of the REB was $9 million............................................................................ 6

        2.    The selling price valuation does not apply to *all* property offered for sale on the date of loss, only the real property that was damaged. ............................................................................... 10

    D.    The AFM Policy's Valuation provision permits AFM to deduct the value of the uninsured land from the selling price of real property. ..........11

        1.    The principle of indemnity underlying property insurance requires the deduction of the value of the uninsured land from the selling price. ........................................................................ 11

        2.    AFM's other policy form cannot be used to interpret the current AFM policy........................................................................... 12

        3.    It is not appropriate to offset the hypothetical cost to make the land "salable." ............................................................................ 12

    E.    The Selling Price Valuation Applies to the Damage to the Seventh Street Garage....................................................................................................13

CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allison v. Nat'l Ins. Underwriters*,
   487 S.W.2d 257 (Mo. Ct. App. 1972) ..................................................................................5

*Cincinnati Insurance Co. v. Bluewood, Inc.*,
   560 F.3d 798 (8th Cir. 2009) ................................................................................................2

*Citizens Ins. Co. v. Kansas City Comm. Cartage, Inc.*,
   611 S.W.2d 302 (Mo. Ct. App. 1980) ..................................................................................5

*Dunn Indus. Grp., Inc. v. City of Sugar Creek*,
   112 S.W.3d 421 (Mo. banc 2003) ......................................................................................12

*Fla. Gaming Corp. v. Affiliated FM Ins. Co.*,
   No. 1:07CV20897, 2008 WL 7072204 (S.D. Fla. May 23, 2008).......................................12

*Sterns v. M.F.A. Mut. Ins. Co.*,
   401 S.W.2d 510 (Mo. Ct. App. 1966) ................................................................................10

**Statutes**

Missouri Revised Statute § 379.150 ................................................................................2, 14

**Other Authorities**

1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance 2d* § 3.1
   (1996)..................................................................................................................................11

Glossary of Insurance and Risk Management Terms 257 (11th ed. 2007) ...........................2

Defendant Affiliated FM Insurance Company ("AFM") for its Reply Memorandum in Support of Its Cross Motion for Partial Summary Judgment states as follows:

## INTRODUCTION

Plaintiffs HH St. Louis LP and Railway Exchange Owner (collectively "REO") concede that the AFM policy's Valuation provision does not violate Missouri law, so summary judgment on that issue must be granted.

AFM is also entitled to summary judgment on the issue that the selling price of the Railway Exchange Building ("REB") was $9 million. It is uncontroverted that the parties allocated $9 million of the purchase price to the REB in the Seventh Amendment to the Purchase Agreement. The two subsequent amendments to the Purchase Agreement (the Eighth and Ninth) not only left intact the $9 million allocation of the purchase price to the REB but expressly confirmed that fact.

Finally, AFM is entitled to summary judgment on the issue that the Valuation provision permits AFM to deduct the value of the uninsured land from the selling price of the REB. This result is required by the principle of indemnity underlying property insurance. If no loss to the REB had occurred, REO would have received the selling price ($9 million) of the REB for both the structure and the underlying land. If AFM paid REO the full $9 million selling price, which includes the value of the uninsured land, REO would receive a windfall because the land is not insured property.

1

# ARGUMENT

A. **REO concedes that AFM's "Valuation" provision is enforceable under Missouri law.**

REO concedes that AFM's policy does not violate Missouri Revised Statute section 379.150 and that *Cincinnati Insurance Co. v. Bluewood, Inc.*, 560 F.3d 798 (8th Cir. 2009) is controlling in federal court. (Pls' Mem. in Opp. to Mot. for Summ. J. (hereinafter "Opp. Mem.") at 9, ECF No. 31.) Therefore, AFM's motion for summary judgment must be granted on this issue.

B. **Because the REB is "real property" and was "offered for sale on the date of loss," the AFM policy plainly and unambiguously provides that the measurement of the loss is determined by the selling price.**

REO claims that AFM is attempting to redraft the AFM policy's Valuation provision to avoid the purpose of the AFM policy, which it claims was to provide $50 million in coverage for the Railway Exchange Building ("REB") and Railway Exchange Garage and Surface Lot ("RRX Garage"). (Opp. Mem. at 4.) REO's argument, however, fails because AFM seeks only to apply the plain and unambiguous terms of the policy. As explained below, the policy plainly and unambiguously provides that the method of valuation for real property offered for sale on the date of loss is the selling price. Because the REB is "real property" that was "offered for sale on the date of loss," the measurement of the loss is the "selling price."

REO misleadingly refers to the policy's Valuation provision as the "Valuation Limitation." But it is not a limitation, and it does not restrict coverage. To the contrary, the Valuation provision specifies the amount of money that the policy holder will receive from AFM if an insured event occurs. *See generally* Glossary of Insurance and

2

3880849.1

Risk Management Terms 257 (11th ed. 2007) (defining "Valuation" as "[a] provision in a property or inland marine policy that specifies the basis of indemnification when property is destroyed.").

The Valuation provision provides several different methods of valuation, depending on various factors, like the type of damage property involved:

## LOSS ADJUSTMENT AND SETTLEMENT

L.  **VALUATION**

Adjustment of the physical loss amount(s) under this Policy will be as of the date of loss at the place of loss, and for no more than the interest of the Insured.

1. Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:

   **a)** The cost to repair.

   **b)** The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

   **c)** The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

2. On **raw materials**, supplies and merchandise not manufactured by the Insured, the replacement cost.

3. On **stock in process**, the value of **raw materials** and labor expended plus the proper proportion of overhead charges.

4. On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which such finished goods would have been subject had no loss happened.

5. On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of

      copying information from backup or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

6. On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss. Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) of the Policy and shall be subject to the limit(s) of liability for Terrorism, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the Limits of Liability clause in the Declarations section.

7. On personal property that is part of a pair or set, and the physically damaged personal property cannot be replaced or repaired, the reduction in value of the undamaged portion of insured personal property. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such property to this Company.

8. On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

9. On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

10. On property scheduled for demolition, the increased cost of demolition, if any, directly resulting from insured loss.

11. On improvements and betterments, the unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

12. On property that is useless to the Insured, the **actual cash value**.

13. On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the **actual cash value**.

> The Insured may elect not to repair or replace the insured real or personal property under Item 1 above that is lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at a **described location** under this Policy. This item does not extend to Demolition and Increased Cost of Construction.

(AFM Policy at AFM0000047, AFM0000050-51, attached as Ex. 2 to Pazdera Decl., ECF No. 27-1 (bold in original).)

There is no dispute that the REB is "real property" and that it was "offered for sale on the date of loss." (REO's Response to AFM's SUMF, ¶¶ 5, 6, 12, ECF No. 32.) Therefore, the method of valuation specified by the AFM policy for this circumstance is paragraph no. 8:

> **8.**     On real property or machinery and equipment, other than stock, offered for sale on the date of the loss, the selling price.

This language is simple and unambiguous.[1]

The purpose of this method of valuation is readily apparent. The selling price of property offered for sale represents the value of that property to the insured. If no loss to the property occurs, the insured would have received the selling price. Because the

---

[1] REO claims that the Valuation provision must be read narrowly, citing cases involving exclusionary clauses. (Opp. Mem. at 4, citing *Citizens Ins. Co. v. Kansas City Comm. Cartage, Inc.*, 611 S.W.2d 302, (Mo. Ct. App. 1980) and *Allison v. Nat'l Ins. Underwriters*, 487 S.W.2d 257 (Mo. Ct. App. 1972).) The Valuation provision is not an exclusion and it does not restrict coverage. Rather, it is a measurement provision, providing how a loss is measured and paid under the policy. Thus, the cases holding that exclusionary provisions must be read narrowly are inapplicable.

5

underlying purpose of property insurance is to provide indemnity for insureds, the insured can recover no more than the selling price if the insurance property is damaged or destroyed.

In sum, AFM is not attempting to redraft the AFM policy's Valuation provision. Rather, the policy plainly and unambiguously provides that the method of valuation for real property offered for sale on the date of loss is the selling price. Because the REB is "real property" that was "offered for sale on the date of loss," the measurement of the loss is the "selling price."

C. **The selling price of the REB was $9 million.**

   1. **There is no genuine factual dispute that the selling price of the REB was $9 million.**

Next, REO seeks to avoid the selling price valuation by arguing that the REB "was not offered for sale, separately, on the date of loss." (Opp. Mem. at 6.) It is REO, not AFM, who is attempting to rewrite the Valuation provision. The AFM policy does not limit application of the selling price valuation to real property "offered separately for sale." As explained above, the method of valuation for "real property" that was "offered for sale on the date of loss," is the "selling price." And the REB selling price was $9 million as specifically negotiated between the buyer, REO, and the seller, HH St. Louis—not $20,225,000 for the REB *plus* the other assets that REO sold to HH St. Louis.

REO entered into a purchase agreement dated as of April 21, 2016 to sell "Assets," only one of which was the REB. (REO's Response to AFM's SUMF, ¶¶ 5, 6, ECF No. 32.) According to the Purchase Agreement, these "Assets" included these items:

6

1.      Fee title to the Railway Exchange Property;[2]

2.      Leasehold interest to the Parking Garage under the ground lease with Garage Owner Lessor and the Third Party Ground Lease;

3.      Fee title to the Parking Garage Fee Parcel;

4.      Fee title to the Surface Lot; and

5.      All related rights and interests of Sellers in and to the Railway Exchange Property, the Railway Exchange Garage Property, the Parking Garage Fee Parcel and the Surface Lot, including all rights under the Redevelopment Agreement, the Railway Exchange Building TDD and the Railway Exchange Building CID. (REO's Response to AFM's SUMF, ¶ 5, ECF No. 32.)

In the Fourth Amendment to Purchase Agreement the parties allocated $13 million of the purchase price to the sale of the Railway Exchange Property (and $6,975,000 to the sale of the Parking Garage and Surface Lot). (Fourth Amendment to Purchase Agreement, § 17 at AFM0000278, attached as Ex. 1 to Pazdera Decl.) Later, the Seventh Amendment to Purchase Agreement, dated as of September 2, 2016, changed the allocation of the purchase price to the Railway Exchange Property from $13 million to $9 million:

> 2.      Notwithstanding the provisions of Section 17 of the Fourth Amendment to Purchase Agreement, Six Million Nine Hundred Seventy Five Thousand Dollars

---

[2] The "Railway Exchange Property" is defined in the Purchase Agreement to mean "the real property known as Railway Exchange, located at 600 Locust Street, St. Louis, Missouri, consisting of approximately 1,200,000 square feet of commercial office space and associated real and personal property." (REO's Response to AFM's SUMF, ¶ 12, ECF No. 32.)

7

>> ($6,975,000.00) of the Purchase Price shall be allocated to the sale of the Parking Garage and Surface Lot, Four Million Dollars ($4,000,000.00) of the Purchase Price shall be allocated to the sale of the TIF-B Note and Nine Million Dollars ($9,000,000.00) shall be allocated to the sale of the Railway Exchange Property.

(Seventh Amendment to Purchase Agreement, § 2 at AFM0000289, attached as Ex. 1 to Pazdera Decl.)

REO contends that the $9 million allocation of the purchase price to the REB is no longer valid because two things occurred after the Seventh Amendment: (1) the overall purchase price for all of the Assets being sold increased by $250,000; and (2) the Assets were actually sold for the increased purchase price with no allocation. (Opp. Mem. at 7.) REO's argument lacks merit for two reasons.

First, the Eighth Amendment (the only subsequent pre-loss amendment) not only left intact the $9 million allocation of the purchase price to the REB but expressly confirmed that fact. To be sure, the Eighth Amendment modified only a few portions of the purchase agreement: A credit against the purchase price; the closing date; the "Purchase Price," a December 2016 extension payment, and a January 2017 extension payment. (Eighth Amendment to Purchase Agreement, §§ 1-5, at AFM0000292-93, attached as Ex. 1 to Pazdera Decl.) "Purchase Price" is a defined term, and it is the purchase price of all "Assets" being sold (the REB being only one of them). (Purchase Agreement, Definitions, at AFM0000236-37, attached as Ex. 1 to Pazdera Decl.)

The Eighth Amendment expressly confirmed that the remainder of the Purchase Agreement was unchanged and remained in full force and effect:

8

> 6. Except as amended hereby, the Purchase Agreement is ratified and confirmed and remains in full force and effect.

(Eighth Amendment to Purchase Agreement, § 6 at AFM0000293, attached as Ex. 1 to Pazdera Decl.)

Thus, the allocation of $9 million to the REB in the Seventh Amendment was not only unchanged by the Eighth Amendment, it was "ratified and confirmed and remain[ed] in full force and effect."

Second, the post-loss $250,000 increase in the Purchase Price for the various Assets is irrelevant because under the Valuation provision the selling price is determined "as of the date of loss at the place of loss." (AFM Policy at AFM0000050, attached as Ex. 2 to Pazdera Decl., ECF No. 27-1.) In any event, the Ninth Amendment, like the Eighth Amendment, did not change the $9 million allocation of the purchase price to the REB and expressly confirmed that the remainder of the Purchase Agreement was unchanged and remained in full force and effect. (Ninth Amendment to Purchase Agreement, § 7 at HH0000081, attached as Ex. 4 to Hunt Aff., ECF No. 32-1 at PageID#1787.)[3]

In sum, AFM did not arbitrarily allocate $9 million of the purchase price to the REB or use a hypothetical "selling price" as REO suggests. Rather, AFM used the selling

---

[3] REO questions how the additional $250,000 of the purchase price should be allocated, that is, should it be added to the REB purchase price, allocated proportionately, or something else? (Opp. Mem. at 7.) Because REO and HH St. Louis did not allocate the $250,000 in the Purchase Agreement, it simply remained an unallocated amount.

9

3880849.1

price as specifically negotiated between the buyer, REO, and the seller, HH St. Louis. Summary judgment on this issue is appropriate.

### 2. The selling price valuation does not apply to *all* property offered for sale on the date of loss, only the real property that was damaged.

REO purports to incorporate by reference the arguments made in its summary judgment reply memorandum. (Opp. Mem. at 1.) One argument REO made in its reply memorandum is that the Valuation provides recovery for the selling price of *all* real property offered for sale, which was $20,225,000. (Reply Mem. at 5-6, ECF No. 29.) This argument fails because the Valuation provision addresses the measurement of the loss to damaged property, and the only real property that was damaged was the REB.

Indeed, the "real property" that sustained physical loss was the REB. And the Valuation provision provides that the selling price of that particular "real property" is the measurement of the loss under the AFM policy. The other "Assets" that were offered for sale (the Parking Garage, Surface Lot, etc.) suffered no damage.

It makes no sense to value the physical damage to the REB based on the selling price of the REB plus selling price of the other "Assets"— the leasehold interest to the Parking Garage, the Parking Garage Fee Parcel, the Surface Lot, and all related rights and interests of REO in and to the Railway Exchange Property, the Railway Exchange Garage Property, the Parking Garage Fee Parcel and the Surface Lot, including all rights under the Redevelopment Agreement, the Railway Exchange Building TDD and the Railway Exchange Building CID. Interpreting the AFM policy in such a manner would improperly result in a windfall to REO. *See Sterns v. M.F.A. Mut. Ins. Co.*, 401 S.W.2d

10

510, 514 (Mo. Ct. App. 1966) (insurance contracts should be construed to effectuate the purpose of indemnifying the insured).

D. **The AFM Policy's Valuation provision permits AFM to deduct the value of the uninsured land from the selling price of real property.**

   1. **The principle of indemnity underlying property insurance requires the deduction of the value of the uninsured land from the selling price.**

REO also claims that the Valuation provision does not allow AFM to deduct the value of the uninsured land from the selling price of the REB. (Opp. Mem. at 8-9.) But REO is wrong.

This issue should be governed by the fundamental principles of property insurance. The underlying purpose of property insurance is to provide indemnity for insureds, in other words to compensate the insured for their actual loss sustained:

> It is commonly observed that the basis and foundation of all insurance law is "indemnity." Property insurance provides an excellent example of a contract of indemnity. The goal and purpose of indemnity is to reimburse the insured for the insured's actual property loss sustained (restoration, dollar for dollar) but generally no more. The objective of indemnity is to put an insured in the same (but not better) position the insured would have occupied had no loss occurred. Thus, a first-party property insured is paid (indemnified) only to the extent of the first-party insured's actual, direct property loss (dollar for dollar). To accomplish that, property insurance policies provide alternative limitations on what the first-party insurance company will pay the insured to make sure the insured is paid no more.

1 Eric Mills Holmes & Mark S. Rhodes, *Appleman on Insurance 2d* § 3.1, at 331 (1996).

Deducting the land value from the selling price is required by this principle of indemnity. The REB was offered for sale on the date of loss for $9 million. If no loss had occurred, REO would have received the selling price ($9 million) of the REB (both the

11

structure and the underlying land). If AFM paid REO the full $9 million selling price, which includes the value of the uninsured land, REO would receive a windfall because the land is not insured property.

### 2. AFM's other policy form cannot be used to interpret the current AFM policy.

REO persists in arguing that AFM's failure to include certain language found in another AFM policy at issue in the *Florida Gaming* case precludes AFM from deducting the land value from the REP selling price. (Opp. Mem. at 8-9.)[4] Again, extrinsic evidence cannot be used to interpret the AFM policy issued to REO. *See*, *e.g.*, *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 429 (Mo. 2003) (extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity).

Here, the "Valuation" provision in the AFM policy is not ambiguous.  The exclusion for land is not ambiguous. REO cannot use the language in the AFM policy at issue in the *Florida Gaming* case to create an ambiguity or to interpret the AFM policy here.

### 3. It is not appropriate to offset the hypothetical cost to make the land "salable."

In its reply brief (incorporated by reference), REO claims that "fairness" dictates that the land value "include the hypothetical costs for making that land salable," that is the cost to demolish the structures, fill in the foundation, and regrade the premises.

---

[4] REO's citation to the *Florida Gaming* case is not to the court's opinion. Rather, it is to an exhibit. *See Fla. Gaming Corp. v. Affiliated FM Ins. Co.*, No. 1:07CV20897, 2008 WL 7072204 (S.D. Fla. May 23, 2008).

12

3880849.1

(Reply Mem. at 8, ECF No. 29.) This argument fails because the deduction for land value is not the value of land as vacant.

There are two ways to value land: (1) as currently improved (i.e., with structures on it); or (2) as vacant. If the deduction for land value was the value of land as vacant, REO's argument might have merit. But AFM seeks to deduct the value of the land as currently improved, not as vacant. Therefore, there is no merit to the argument that the land value be offset by the costs to make the land salable.

E.   **The Selling Price Valuation Applies to the Damage to the Seventh Street Garage.**

In its reply brief (incorporated by reference), REO also argues that the selling price valuation does not apply to the costs to repair the damage to property subject to Seventh Street Garage easement because an easement is not "real property" and because the Seventh Street Garage was not offered for sale on the date of loss. (Reply Mem. at 3-5.) REO's argument, however, fails because the damage occurred to a portion of the Seventh Street Garage that was subject to an easement owned by REO that was offered for sale and was included in the selling price of the Railway Exchange Building.

There is no dispute that REO had an easement on certain portions of the Seventh Street Garage. (First Am. Pet., ¶ 55, ECF No. 8.) There is also no dispute that damage occurred to the portions of the Seventh Street Garage subject to this easement. (*Id.*, ¶ 60.) And there's no dispute the Seventh Street Garage easement was included among the "Assets" offered for sale at the time of the loss.

Indeed, according to the Purchase Agreement, the "Assets" was defined to include "all related rights and interests of Sellers in and to the Railway Exchange

13

Property." (Fourth Amendment to Purchase Agreement, § 5 at AFM0000276, attached as Ex. 1 to Pazdera Decl.) This, of course, would include any easements.

In fact, the Purchase Agreement expressly includes the easement in the contractual definition of "real property":

> "Real Property" - The Railway Exchange Property, the Railway Exchange Garage Property, the Parking Garage Fee Parcel and the Surface Lot, . . .; *all right, title and interest of the Companies in and to easements*, rights of way, air rights, riparian rights, rights of ingress or egress, and all other rights, privileges and appurtenances *owned by the Companies and in any way related to, or used in connection with, the land and improvements*; . . ..[5]

(*Id.* at AFM0000236, emphasis added.)

In short, REO's easement on portions of the Seventh Street Garage (that was damaged) was expressly included in the "Assets" being offered for sale and also in the definition of the "real property" offered for sale in the Purchase Agreement. Therefore, "selling price" valuation applies to damage to property in the Seventh Street Garage.

## CONCLUSION

As discussed above, there are no genuine issues of material fact and AFM is entitled to summary judgment on these issues as a matter of law: (1) the AFM policy's "Valuation" provision is unenforceable and does not conflict with Missouri Revised Statute section 379.150; (2) under the "Valuation" provision, the measurement of loss is the selling price of the Railway Exchange Building, which was $9 million according to

---

[5] "Companies" is defined to include "RE Owner." (Purchase Agreement, Definitions, at AFM0000236, attached as Ex. 1 to Pazdera Decl.) "RE Owner" is the short title for Railway Exchange Owner, LLC. (*Id.*, ¶ A, at AFM0000233.)

14

the plain language of the Purchase Agreement; and (3) AFM was entitled to reduce the coverage by the value of the uninsured land under the Railway Exchange Building because land is specifically excluded from the coverage of the policy. Accordingly, AFM respectfully requests that the Court enter summary judgment in its favor on these issues.

Dated: August 22, 2018                    **TUCKER ELLIS LLP**

By: /s/ Sandra J. Wunderlich
Sandra J. Wunderlich, #39019
100 South 4th Street, Suite 600
St. Louis, MO 63102
Telephone: (314) 256-2550
Facsimile: (314) 256-2549
E-mail: sandra.wunderlich@tuckerellis.com

*Attorneys for Defendant Affiliated FM Insurance Company*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of August, 2018 a true and correct copy of the foregoing instrument was electronically filed with the Clerk of Court and served to all counsel of record via the Court's CM/ECF System.

/s/ Sandra J. Wunderlich
Attorney for Defendant
Affiliated FM Insurance Company

89226203.1

15

3880849.1